**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

ALLEN R. RICHARDSON,

                          Plaintiff,

     v.                                      No. 06-CV-301
                                               (FJS/DRH)

COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.

_____

**APPEARANCES:**                       **OF COUNSEL:**

CONBOY, McKAY, BACHMAN &         LAWRENCE D. HASSLER, ESQ.
     KENDALL, L.L.P.
Attorney for Plaintiff
307 State Street
Carthage, New York 13619

HON. GLENN T. SUDDABY           SUZANNE M. HAYNES, ESQ.
United States Attorney for the Northern    Special Assistant U.S. Attorney
   District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**


**REPORT-RECOMMENDATION AND ORDER**[1]

     Plaintiff Allen R. Richardson ("Richardson") brought this action pursuant to 42

U.S.C. § 405(g), seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for benefits under the Social Security Act.

Richardson moves for a finding of disability and the Commissioner cross-moves for a

_____

     [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

judgment on the pleadings.  Docket Nos. 5, 8.  For the reasons which follow, it is

recommended that the Commissioner's decision be reversed.

## I. Procedural History

On March 10, 2003, Richardson filed for disability benefits alleging an onset date of

September 30, 2001.  T. 46-48.[2]  The application was denied on April 28, 2004.  T. 33-36.

Richardson requested a hearing before an administrative law judge ("ALJ"), which was

held before ALJ William E. Russell on October 3, 2005.  T. 41, 263.  In a decision dated

November 21, 2005, the ALJ held that Richardson was not entitled to disability benefits.

T. 30-32.  On November 21, 2005, Richardson filed a request for review with the Appeals

Council.  T. 4.  The Appeals Council denied Richardson's request for review on February

23, 2006, thus making the ALJ's findings the final decision of the Commissioner.  T. 4-6.

This action followed.

## II. Contentions

Richardson contends that the ALJ erred when he failed to (1) assess properly the

severity, either alone or in combination, of Richardson's mental and emotional

impairments;[3] (2) assess properly Richardson's credibility concerning his statements of

---

[2] "T." followed by a number refers to the pages of the administrative record filed
by the Commissioner.  Docket No. 4.  Additionally, Richardson has filed two prior
disability applications on July 3, 1996 and March 31, 2000.  T. 49.  Both claims were
denied and not appealed.  Id.

[3] Initially, Richardson sought disability benefits for depression, Post-Traumatic
Stress Disorder ("PTSD"), substance abuse, Bell's Palsy, gastroesophageal reflux
syndrom, and hypertension.  T. 66-67.  The ALJ held that Richardson's severe

pain and disability; and (3) support his conclusion that Richardson could perform other work that existed in the national economy.  The Commissioner contends that there was substantial evidence to support the determination that Richardson was not disabled.


### III. Facts

Richardson is now fifty years old and completed high school and two years of vocational training in the health care field.  T. 60, 115-16, 289.  Richardson was honorably discharged from the Army after six years of service working with the medical staff and driving ambulances.[4]  T. 184, 270.  Additionally, Richardson has worked as a chauffeur, laborer loading trucks, phlebotomist, medical laboratory technician, and biochemical coordinator.  T. 67, 96, 113-14, 269.  Richardson alleges disability due to depression, Post-Traumatic Stress Disorder ("PTSD"),[5] and substance abuse.  Docket No. 5 at 16-17.

---

impairments were his hypertension, PTSD, depression, and substance abuse in remission.  T.30-31.  However, Richardson contends that the ALJ erred in evaluating his mental impairments as those are responsible for his primary limitations.  Docket No. 5 at 16-20, 22.  Thus, only Richardson's mental impairments will be addressed here.

[4] Richardson was stationed in West Germany at a training area where military personnel were introduced to equipment and protocols to ready them for deployment.  T. 285.  As a result of the vast training and unfamiliarity with the equipment, there were multiple training accidents for which Richardson was charged with transporting soldiers and providing medical attention during which he witnessed numerous fatalities.  T. 184, 270, 285.

[5] PTSD is "[a] disorder in which an overwhelming traumatic event is reexperienced, causing intense fear, helplessness, horror, and avoidance of stimuli associated with the trauma."  THE MERCK MANUAL 1517 (17th ed. 1999).

3

## IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ." 42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her]

disabled without considering vocational factors such as age, education, and
work experience; the [Commissioner] presumes that a claimant who is
afflicted with a 'listed' impairment is unable to perform substantial gainful
activity.  Assuming the claimant does not have a listed impairment, the fourth
inquiry is whether, despite the claimant's severe impairment, he [or she] has
the residual functional capacity to perform his [or her] past work.  Finally, if
the claimant is unable to perform his [or her] past work, the [Commissioner]
then determines whether there is other work which the claimant could
perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial burden

of proof to establish each of the first four steps.  DeChirico v. Callahan, 134 F.3d 1177,

1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth

step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage

in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

When asked to determine the existence of a mental impairment, the Regulations

set forth a specific procedure similar to the five-step analysis outlined above.  First, the

Commissioner must "evaluate [the] pertinent symptoms, signs, and laboratory findings to

determine whether [there is] a medically determinable mental impairment," as defined

above.  20 C.F.R. § 404.1520(a)(b)(1).  Then, it must be determined whether there has

been a degree of functional loss as a result of the mental impairment.  Id. §

404.1520(a)(c)(3).  During this assessment, four areas of functioning are considered: (1)

activities of daily living, (2) social functioning, (3) concentration, persistence or pace, and

(4) episodes of decompensation.  Id. § 404.1520(a)(c)(3).  The first three areas of

functioning are measured on a five point scale[6] and the last on a four point scale[7].  If the Commissioner "rate[s] the degree of [the] limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, [he or she] will generally conclude that [the] impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [claimant's] ability to do basic work activities."  Id. § 404.1520(a)(d)(1).  If the impairment is severe, as discussed supra, it will the be determined whether it meets the criteria of a listed impairment.  Id. § 404.1520(a)(d)(2).  If it is severe yet not equal to a listed impairment, the claimant's residual functional capacity is then assessed.  Id. § 404.1520(a)(d)(3).


## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with

---

[6] The claimant's functional loss of his or her activities of daily living, social functioning, and concentration are characterized as either non-existent, mild, moderate, marked, or extreme.  20 C.F.R. § 404.1520(a)(c)(4).

[7] The episodes of decompensation are measured with four tiers beginning with no episode, one or two episodes, three episodes, or four of more episodes.  Id.

sufficient specificity to allow a court to determine whether substantial evidence supports

the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005)

(citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot

substitute its interpretation of the administrative record for that of the Commissioner if the

record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106,

111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it

is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.


## V.  Discussion

### A. Medical Evidence

Richardson had previously been hospitalized in Queens in 1994 and the

Canandaigua Veterans Administration (VA) Hospital in 1996 and 1998 for treatment for

PTSD and substance abuse.  T. 183, 184.  On January 20, 1998, Richardson presented to

the Canandaigua VA medical staff complaining of flashbacks of previous military patients

who had died under his care.  T. 126, 127.  These flashbacks led to insomnia and

Richardson requested a psychological evaluation and treatment.  Id.  The diagnosis was

"probably PTSD" and Richardson was sent for an evaluation.  Id.

In February 2003, after a short incarceration resulting from Richardson's third

conviction for driving while intoxicated (DWI), Richardson enrolled in a substance abuse

treatment program through the Salvation Army.  T. 184.  This in-patient program was

offered to Richardson through the VA.  T.183.   On May 15, 2003, during a session with

social worker Pat Pomeroy, Richardson surmised that he was using substances to self-

medicate in response to his vivid flashbacks and recurring nightmares.  T. 166.  On May

21, 2003, during a session with Pomeroy, Richardson presented with continuing

flashbacks and memories from his military service, acknowledged his substance abuse

problem as an attempt to self-medicate, and identified his work at Ground Zero following

the September 11th attacks as the trigger for his flashbacks and substance abuse.  T. 163.

Pomeroy noted that Richardson was cooperative and calm, but depressed.  T. 164.

Additionally, Richardson's thought process, memory, cognitive function, judgment, and

insight were intact; he was oriented to time, place, person and situation; and although

Richardson was experiencing hallucinations, he had no delusions or suicidal ideations.  Id.

On May 29, 2003, Richardson met with social worker Jill Semones, stating that

while he was still having nightmares, they had become less distressing and vivid since he

began counseling.  T. 162.  On June 19, 2003, Richardson met again with Pomeroy and

stated that he was "doing as well as can be expected."  T. 160.  Richardson was still

experiencing nightmares leading to difficulty sleeping at night; however, he was able to

sleep during the day to counteract his insomnia.  T. 161.  Additionally, this sleeping pattern

was not disruptive as Richardson was accustomed to working at irregular hours.  Id.

Richardson was calm, fully oriented, experiencing no problems with memory, exhibiting

intact cognitive function, judgment and insight, and not suffering from hallucinations,

delusions, or suicidal ideations.  T. 161-62.

Richardson saw Dr. Isabel Jimenez on June 29, 2003.  Richardson reported that

although he had maintained sobriety since the end of January 2003, he still had problems

sleeping due to memories, feared crowds and isolation, and had difficulty getting along

with others.  T. 157.  Dr. Jimenez echoed previous assessments noting that Richardson

was cooperative and appropriate, fully oriented, was not suffering from delusions or suicidal ideations, and had intact immediate and remote memory, cognitive function, judgment, and insight.  T. 158.  However, Richardson was experiencing hallucinations and his recent memory was impaired.  Id.

On September 18, 2003, Richardson was seen by Pomeroy.  Pomery noted that while the nightmares and flashbacks were still present, "they currently seem to be with less frequency and intensity."  T. 151, 181.  Richardson's depression had become transient. Id.  Pomeroy confirmed that Richardson's military service corresponded with his PTSD symptoms and that upon his upcoming discharge, Richardson's symptoms would likely increase due to "emotional flooding and overwhelmed frustration tolerance capacity."  T. 152, 181.  Richardson was again described as cooperative but depressed, with fully intact memory, cognitive function, judgment, and insight, and full orientation.  T. 152, 182. Richardson was characterized as maintaining sobriety, having a "fair response to [the] medication . . . ," and an "active[] engag[ment] in therapy."  Id.

During his outpatient therapy with Dr. Jimenez on September 25, 2003, Richardson still complained of nightmares and interrupted sleep, averaging two to three nightmares a week, and a fear of crowds and isolation.  T. 149, 179.  The memories and flashbacks remained related to his prior active duty in Germany working at a medical clinic and treating wounded soldiers.  Id.  Dr. Jimenez noted that Richardson was cooperative but depressed, his thought process, immediate and remote memory, cognitive function, judgment, and insight were intact although his recent memory was impaired, and he was fully oriented.  T. 150, 180.

On October 1, 2003, Richardson was seen by Dr. Mian Ahmad.  T. 148, 178.  Dr.

Ahmad indicated that Richardson's appetite and sleep schedules were adequate despite suffering from nightmares and flashbacks.[8] Id.  On October 17, 2003, Richardson again met with Pomeroy.  T. 147, 178.  It was noted that Richardson was still sober, taking his medication properly, and "feeling good, experiencing no depression . . . , and would like to simply 'float on this bubble' for a short time."  Id.

On November 4, 2003, Richardson met with Dr. Jimenez because he was apprehensive about beginning his new work as a laboratory technician in a hospital.  T. 145, 176.  Richardson feared that if he was asked to perform certain duties, it would trigger his PTSD.  T. 146, 176.  Additionally, Richardson was continuing to have nightmares, flashbacks, and a fear of crowds, as well as experiencing hypervigilance and anger.  Id.  Richardson remained sober and was labeled "stable but with positive PTSD symptomology."  T. 146, 176-77.  Richardson met with Pomeroy later in the month because he was being continually plagued by a recent nightmare.  T. 144, 174.  Pomeroy noted that Richardson was still sober, cooperative, and calm; his thought process, memory, cognitive function, judgment, and insight were intact; he was fully oriented; there was no indication of hallucinations, delusions, or suicidal ideations; and his situation was positive as he was having a "good response to medication and [wa]s engaged in therapy." T. 144-45, 175.

---

[8] Richardson contends that his hypertension was a side effect of his mental conditions.  During the visit with Dr. Ahmad, it was noted that the hypertension was controlled with medication.  T. 149, 178.  Additionally, multiple medical progress notes in 2004 indicate that overall, Richardson has been feeling well and the condition has been controlled with medication, although at times dosage changes have been required.  T. 173, 142, 236, 172, 188, 235.  In this case, Richardson has failed specifically to contend that his hypertension is a severe medical condition.  Therefore, that condition will not be further discussed.

On April 6, 2004, Richardson underwent a psychiatric examination with State Evaluator Dr. Kristen Barry.  T. 183-89.  Dr. Barry noted that Richardson had an interrupted sleep cycle, waking approximately three times per night with recurring nightmares about soldiers that had been under his care and passed away while he was in the service.  T. 183-84.  Additionally, he had a decreased appetite, was in a terrible mood, and sometimes experienced nausea, crying spells, dysphoric mood,[9] loss of energy, and diminished senses of pleasure.  Id.  Richardson was not suicidal but was apathetic about whether he lived or died.  Id.  Richardson also reported difficulty concentrating and going to public places because it caused him to panic.  Id.  Richardson was again cooperative but depressed, with coherent and goal-directed thought processes, no evidence of hallucinations, delusions or paranoia, full orientation, and exhibiting intact attention, concentration, and memory.  T. 185.  Richardson was also deemed to have average intelligence and fair to good insight and judgment.  Id.

Dr. Barry noted that while Richardson could not drive,[10] he was able to dress, bathe, and groom himself, successfully complete daily tasks such as cooking, cleaning, laundry, and shopping, and possessed good family relationships.[11]  T. 185-86.  Dr. Barry concluded that Richardson's allegations were consistent with the examination results and that he was

---

[9] A dysphoric attitude is one which is manifested by "disquiet, restlessness, [and] malaise."  Id. 517.

[10] Richardson was charged with DWI in May 2002 which resulted in a conditional discharge and suspended sentence; however Richardson relapsed which resulted in an incarceration from December 23, 2004 to January 28, 2005.  T. 267-68.

[11] Richardson completed a New York State Disability form on March 25, 2004 where he stated that his daily activities included getting his granddaughters ready for school, starting dinner and the laundry, caring for the dog, assisting with homework and the grandchildren's baths, and performing household chores including mowing, snow removal, and repairs.  T. 86-88.

an intelligent man who had difficulty handling stressors.  T. 186.  The report also

recommended medical and psychiatric intervention with a guarded prognosis.  Id.  The

same day Richardson had an internal medical examination with State Evaluator Dr.

Kalyani Ganesh.  T. 188-89.  Dr. Ganesh noted that despite Richardson's PTSD,

insomnia, clinical depression, and anxiety he was able to cook, clean, and do laundry five

days per week, provide childcare for his two dependant grandchildren, and independently

attend to his personal hygiene.  T. 189.

On April 30, 2004, Richardson underwent a mental residual functional capacity

(RFC) assessment with State Examiner Dr. Carlos Gieseken.  T. 200-18.  Dr. Gieseken

determined that Richardson was not significantly limited in his understanding, memory,

ability to carry out short and detailed instructions, maintain a routine, work in coordination

with others, adapt to changing work settings and goals, and make simple decisions.

However, he was moderately limited in the ability to maintain concentration for extended

periods of time, regularly perform scheduled activities, and complete a normal workday

and workweek without interruptions from psychologically based symptoms.  T. 200-01.

Overall, Richardson had mild limitations in his activities of daily living and ability to function

socially with others, moderate difficulties in maintaining concentration, persistence, and

pace, and suffered two repeated episodes of decompensation which lasted for an

extended duration.  T. 214.  Additionally, Dr. Gieseken determined that while Richardson

was suffering from listed conditions encompassed within categories 12.06 and 12.09,

neither his PTSD nor alcohol dependence "precisely satisf[ied] the diagnostic criteria . . . ."

T. 204, 209, 212.  Thus, Richardson would "need unskilled entry level work where he did

not have to work closely with others to engage in sustained work activity."  T. 202.

Richardson met with psychiatrist Alison Lentz on December 2, 2004.  T. 246. Richardson presented with depression and PTSD.  Id.  Dr. Lentz discussed Richardson's extensive mental health history and noted that Richardson had been prescribed multiple anti-depressants which temporarily alleviated his acute problems although none provided him with any long-term relief.  Id.  Dr. Lentz confirmed that Richardson was restless, hypervigilante, fully oriented, and had fair judgement.  T. 247.  Additionally, Dr. Lentz stated that Richardson's ability to concentrate and attend to situations was fair, at best.  Id.

On June 14, 2005, Richardson met with psychologist William Kimball.  T. 241.  Dr. Kimball noted that Richardson was a "stay at home father" caring for his two grandchildren after his daughter passed away.  T. 242.  Richardson reported that he was "OK 90% of the time."  Id.  Richardson had another follow-up with Dr. Kimball on July 5, 2005, where Richardson reported that he was still sober and although he was not as emotional as the prior meeting, Richardson was still having nightmares.  T.239.  On August 30, 2005, Dr. Kimball again noted Richardson's sobriety and stated that Richardson was still suffering from flashbacks and nightmares which caused sleeplessness.  T. 238.

On October 3, 2005, Richardson testified that he was still sober and that his depression, anxiety, and PTSD had caused great deterioration in his prior condition.  He saw a psychiatrist once a week with regular appointments at least three times a month.  T. 273.  Additionally, he attended depression and anxiety group sessions once a week.  T. 284. Richardson only slept a few hours once or twice a week due to his nightmares and flashbacks which numbered twenty to thirty occurrences per week.  T. 277, 279.  These attacks could produce a crying spell.  T. 278.  Richardson also volunteered at a local cancer society and rode his bicycle at least two hours a day.  T. 278.

**B. Severity**

Richardson contends that the ALJ failed properly to assess the severity of his conditions.  The Commissioner contends that the ALJ properly evaluated the severity of Richardson's impairments.

As mentioned above, step two of the sequential evaluation process requires a determination whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities.  See subsection IV(A) supra; 20 C.F.R. § 404.1521(a) (2003).  Where a claimant alleges multiple impairments, a court will consider "the combined effect of all [] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  Id. § 404.1523.  An impairment, or combination thereof, is not severe if it does not impinge on one's "abilities and aptitudes necessary to do most jobs."  Id. § 404.1521.  Basic work activities which are relevant for evaluating the severity of a physical impairment include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. . . ."  Id. § 404.1521(b)(1).

 "The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability."  DeChirico, 134 F.3d at 1180; see also 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P. App. 1 (2003) (listing of per se disabling ailments).  Additionally, the regulations state that "if an individual has an impairment that is 'equal to' a listed impairment," that individual is disabled regardless of his or her age, education, or work experience.  DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

Richardson contends that his PTSD, depression, anxiety, and substance abuse

14

should have been classified as a disability per se based either on  § 12.06[12] or § 12.09.[13]

Under § 12.06, the plaintiff must demonstrate an anxiety ailment and either (1) two marked

restrictions or difficulties, or (2) the "complete inability to function independently outside

one's home.  20 C.F.R. pt. 404, subpt. P, App. 12.06 (2003).  An anxiety ailment is either

(1) "[g]eneralized persistent anxiety . . . ," (2) "persistent irrational fear . . . ," (3) "[r]ecurrent

severe panic attacks . . .," (4) "[r]ecurrent obsessions or compulsions . . .," or (5)

"[r]ecurrent and intrusive recollections of a traumatic experience . . . . ."  Id. § 12.06(A).

Marked restrictions or difficulties include (1) restrictions in daily activities, (2) difficulty with

socialization and function, (3) marked inability to maintain concentration, or (4) multiple,

repeated instances of decompensation.  Id. § 12.04(B).

In this case, the ALJ determined that although Richardson's PTSD, depression, and

substance abuse were severe, they were not severe enough, alone or in combination, to

constitute a listed impairment.  T. 30-31.  The ALJ stated that Richardson's condition was

not sufficiently severe because (1) his reasons for discontinuing work in the medical field

were inconsistent; (2) despite his aversion to medical work due to its propensity to trigger

his PTSD, all recent employment that was attempted was in the health care field; (3) he

retained a high level of daily activities acting as a "stay at home dad"; (4) he did not seek

treatment for his PTSD until May 2003, nearly twenty months after his alleged onset of

disability; and (5) he only claimed to be disabled after returning to a rehabilitation program

after his third DWI.  T. 27.

---

[12] This section concerns anxiety-related disorders.  20 C.F.R. pt. 404, subpt. P, App. 12.06 (2003).

[13] This section concerns substance addiction disorders.  20 C.F.R. pt. 404, subpt. P, App. 12.09 (2003)

However, Richardson documented a history of an anxiety-related disorder. Richardson has had documented claims since 1998 of insomnia due to nightmares and flashbacks of events occurring while he was a medic.  T. 126, 127.  Additionally, Richardson was hospitalized for PTSD and substance abuse in 1994, 1996, and 1998.  T. 183, 184.  While Richardson clearly demonstrated that he had recurrent and intrusive recollections of a traumatic experience with his flashbacks and nightmares, he failed to demonstrate that he was suffering from a marked restriction or the complete inability to function independently outside his home.

Richardson cannot satisfy the second prong of the analysis because he failed to demonstrate a marked restriction or difficulty.  Richardson's social worker classified his PTSD as "moderate" and not marked.  T. 152, 181.  Additionally, although the State examination with Dr. Barry resulted in a "guarded" prognosis, recommending additional medical care and psychiatric intervention, Richardson was still able to maintain attention and concentration despite his difficulty handling stress.  T. 186.  Moreover, the mental RFC assessment demonstrated that Richardson was only moderately, and not markedly, limited in his ability to maintain concentration, regularly perform activities within a schedule, and complete a normal workday and workweek.  T. 200-01.  His ability to complete daily activities and socially interact  were not as severe as his aforementioned limitations.  Id.  This is inadequate to satisfy the burden of marked restrictions in daily activities, ability to concentrate, or function socially.  Additionally, even if Richardson could assert that he had multiple episodes of decompensation, it would not be sufficient to fulfill the second prong of the analysis as it requires two showings of restriction or difficulty.

Richardson also cannot satisfy the requirement that he was unable to live

independently.  Although Richardson had been hospitalized on multiple occasions, he had

been released, was living at home, and was functioning well.  This is further confirmed by

Dr. Gieseken's mental RFC assessment which concluded that while Richardson suffered

from a severe PTSD impairment, it does not satisfy the diagnostic criteria to constitute a

listed impairment.  T. 209.

"[I]n 1996, Congress passed the Contract with America Advancement Act . . . which

eliminated disability benefits . . . where the basis of the disability was alcohol or drug

abuse."  Wright v. Barnhart, No. 05-CV-119 (MRK/WIG), 2006 WL 2927089, at *10 (D.

Conn. Aug. 4, 2006).  Therefore, "an individual shall not be considered to be disabled . . .

if alcoholism or drug addiction would . . . be a contributing factor material to the

Commissioner's determination . . . ."  42 U.S.C. § 423(d)(2)(C); 42 U.S.C. § 1382c(a)(3)(J).

 Unlike the other sections listed in the appendix, "[l]isting 12.09 is . . . a reference listing . .

. only serv[ing] to indicate which of the other listed . . . impairments must be used to

evaluate the behavioral or physical changes resulting from regular use of addictive

substances."  20 C.F.R. pt. 404, subpt. P, App. 12.00(A).  Thus, "[u]nder both 20 C.F.R. §

404.1535 (disability) and 20 C.F.R. § 416.935 (supplemental security income), the relevant

inquiry is 'whether [the Commissioner] would still find [the claimant] disabled if [he or she]

stopped using drugs or alcohol.'"  Estes v. Barnhart, 275 F.3d 722, 724-25 (8th Cir. 2002);

see also Wright supra at *10.

Therefore, Richardson may not be disabled based solely upon his substance abuse

history.  As discussed supra, Richardson did not meet the listed impairment requirement

for his PTSD.  Thus, Richardson's mental impairments, alone or in combination, are

insufficient to constitute a severe listed impairment.

Accordingly, it is recommended that the Commissioner's findings in this regard be affirmed.

### C.  Subjective Complaints of Pain

Richardson contends that the ALJ's decision to discredit his subjective complaints of pain and disability was in error. The Commissioner contends that the ALJ properly considered Richardson's symptoms.

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003).  This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529 (2003). "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'" Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence.  20 C.F.R. § 404.1529 (2003).  "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings."  Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983) (citing Gallagher v.

18

Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability requires more than mere

inability to work without pain."  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).

Pain is a subjective concept  "difficult to prove, yet equally difficult to disprove" and courts

should be reluctant to constrain the Commissioner's ability to evaluate pain.  Dumas v.

Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  In the event there is "conflicting evidence

about a [claimant's] pain, the ALJ must make credibility findings."  Snell v. Apfel, 177 F.3d

128, 135 (2d Cir. 1999) (citing Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir.

1983)).  Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's

decision is supported by substantial evidence.  Aponte v. Sec'y of HHS, 728 F.2d 588, 591

(2d Cir. 1984).

    The claimant's credibility and motivation, as well as the medical evidence of

impairment, are used to evaluate the true extent of the alleged pain and the degree to

which it hampers the applicant's ability to engage in substantial gainful employment.  See

Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must consider several factors

pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (I)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the
> claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any
> medication [the claimant] take[s] or ha[s] taken to alleviate . . .
> pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s]
> or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve .

19

. . pain or other symptoms (e.g., lying flat on [his] back,
standing for 15 to 20 minutes every hour, sleeping on a board,
etc.); and

(vii) Other factors concerning [the claimant's] functional
limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that Richardson's "allegations regarding his
limitations [resulting from his mental impairments] are not totally credible for the reasons
set forth [supra in Section V(B)]."  T. 31.  However, these findings are not fully supported
by substantial evidence in the medical record.  Richardson retained the ability to carry out
a multitude of his activities of daily living including, but not limited to, cooking, cleaning,
laundry, home repairs and maintenance, and providing childcare for his dependent
grandchildren.  T. 185-86, 189, 242.  The ALJ claims that because Richardson was able to
care for his grandchildren and deflect his flashbacks while tending to their care,
Richardson was not suffering from a mental ailment.  While Richardson testified that he
was able to cope with his PTSD more successfully when he was caring for his
grandchildren and a spell arose, he still maintained that he "tend[s] to cry a little bit . . . ."
because the flashbacks did not simply resolve and disappear but lingered.  T. 280.
Further, Richardson testified that the intensity of his symptoms had increased dramatically
and that he suffered between twenty and thirty flashbacks per week.  T. 279.

Despite that ability to postpone the symptoms of his PTSD, the record is replete
with explanations and descriptions of the consistent severity and frequency of his
flashbacks and nightmares.  The ALJ found that Richardson's sobriety in combination with
his medical notes in the Fall and Winter of 2003, which demonstrated that his intrusive

memories were occurring with less frequency and intensity, substantiated the conclusion that Richardson's claims of mental impairment were not credible.  T. 27-28,151, 181. However, Richardson's other medical notes indicate that in the Fall of 2003, his PTSD was still considered moderate, he was averaging two to three nightmares per week, and he was suffering from positive visual flashbacks.  T. 149-50, 179-80.  Additionally, treatment notes in November indicate that while Richardson was stable, he was still suffering from PTSD.  T. 146, 177.  This trend continued in 2004, when it was noted that Richardson felt "OK 90% of the time," yet exhibited an inability to concentrate, restlessness and hypervigilance, and continued flashbacks and nightmares.  T. 246-47, 239, 238.  Thus, Richardson was still experiencing symptomology, albeit reduced.  Moreover, Richardson's suffering was confirmed by Dr. Barry's psychiatric examination in which she stated that "[Richardson's] allegations are found to be consistent with the examination results" and Dr. Gieseken's mental RFC assessment classifying Richardson as having moderate mental limitations which resulted in a severe medically determinable impairment and qualified him for only "unskilled entry level work where he did not have to work closely with others . . . ." T. 186, 200-02.

Additionally, the ALJ did not believe that Richardson's aggravating stressors were as intense as Richardson suggested since Richardson continued to seek work in health care settings.  T. 27.  However, the ALJ mischaracterized the last work Richardson tried to undertake.  This employment in a medical center was not solicited by Richardson but offered to him by a friend attempting to help.  T. 282-83.  In the end, Richardson never attended the job as the smells and sounds of the hospital invoked such anxiety that he was becoming physically ill.  T. 283.  Thus, despite Richardson's extensive counseling and

21

continued sobriety, his PTSD impaired him from successfully completing the work attempt.

The ALJ also pointed to Richardson's alleged lack of treatment for his PTSD as a reason for not finding impaired mental functioning on his behalf.  T. 27.  As was previously discussed, Richardson underwent three rehabilitation hospitalizations.  Additionally, Richardson had attempted various medications to alleviate his PTSD, but the efficacy of the medications were all temporary.  T. 246.  Richardson also attended counseling and group therapy sessions as well as regular follow-up appointments three times per month. T. 273, 284.  While the record is devoid of specific entries of early rehabilitation treatments, it clearly indicates that Richardson's mental health interventions began in 1994 and continued through the hearing before the ALJ.

Therefore, the Commissioner's determinations based upon Richardson's alleged incredibility are in error because there is substantial evidence in the record indicating that (1) although Richardson could successfully perform his activities of daily living, his complaints that he suffered from severe PTSD were supported by the medical evidence; (2) his experiences as a medical technician prohibited him from working in a medical environment; (3) he sought treatment for his mental ailments far before his alleged onset date; and (4) he had attempted multiple medical and therapeutic attempts to alleviate his symptoms and the effects had been transient and non-curative.

Accordingly, it is recommended that the Commissioner's findings in this regard be reversed.

### D. RFC

Richardson contends that the ALJ's findings regarding his RFC were not supported by substantial evidence.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

The ALJ determined that Richardson was not capable of performing his past work. T. 31.  Additionally, there is no dispute about Richardson's physical exertional demands. The ALJ determined that Richardson was "capable of performing a significant range of light work . . . ."  T. 29.  Also, "[d]ue to [Richardson's] emotional symptoms, he needs to be in a fixed location that does not require work around medical equipment or facilities, place him in confrontational stress situations or with the general public."  Id.  The ALJ also indicated that Richardson would need to miss only one day of work per month.  At the hearing, the ALJ asked the vocational expert if there was a job suitable for a younger individual with Richardson's education, past work experience and RFC.  The vocational expert testified that Richardson could work as an order filler, mail clerk, or assembler.  T. 30, 290.  However, the vocational expert also testified that the "maximum tolerated rate of absenteeism for unskilled workers is about a day a month . . . [with a maximum of] about three days a year."  T. 291.  Thus, the vocational expert concluded that "two days [of absenteeism] a month [would be] too much . . . abolish[ing] any occupational base."  Id.

23

The ALJ's assessment of Richardson's absenteeism is not substantially supported by the record.  As discussed <u>supra</u> in subsection V(C), the ALJ improperly determined Richardson's credibility.  Since there is no reason to disbelieve Richardson's testimony that he had three medical appointments per month, resulting in missing three days of work per month and approximately thirty-six days of work per year, Richardson was unemployable according to the vocational expert.  Because Richardson had no viable occupational base, the Commissioner failed to meet his burden of proving that a substantial number of jobs exist for him in the national economy.

Accordingly, it is recommended that the Commissioner's determination in this regard be reversed.

**E. Remand or Reversal**

A reviewing court has the authority to reverse with or without remand.  42 U.S.C. §§ 405(g), 1383(c)(3) (2003).  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  <u>Curry</u>, 209 F.3d at 124.  Reversal is appropriate, however, where there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose.  <u>Id.</u>; <u>see also</u> <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980).  Here, the record is clear regarding Richardson's credibility and RFC.  Therefore, no purpose would be served by remanding the case for further testimony and the credible evidence of record compels a finding of disability.  Accordingly, it is recommended that the decision of the Commissioner be reversed.

## VI. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the decision denying disability benefits be **REVERSED**, Richardson's motion for a finding of disability (Docket No. 5) be **GRANTED**, and the Commissioner's cross-motion (Docket No. 8) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED: April 25, 2008
      Albany, New York

_David R. Homer_
United States Magistrate Judge